UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
LESLIE BALDWIN,

                              Plaintiff,

- against -

NORTH SHORE UNIVERSITY HOSPITAL,

                              Defendant.

---------------------------------------------------------X

**MEMORANDUM OF DECISION AND ORDER**

05 CV 2472 (ADS) (ETB)

**APPEARANCES:**

**LESLIE BALDWIN**
Plaintiff *Pro se*
31 High Court
Manhasset, New York 11030

**OFFICE OF LEGAL AFFAIRS
NORTH SHORE-LONG ISLAND
JEWISH HEALTH SYSTEM**
Attorneys for the Defendant
145 Community Drive
Great Neck, New York 11021
       By:    Mark A. Gloade, Esq.

**SPATT, District Judge.**

The *pro se* plaintiff Leslie Baldwin ("Baldwin" or the "plaintiff") alleges that the defendant North Shore University Hospital ("North Shore" or the "hospital"), her former employer, violated Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII") by discriminating against her because of her race, namely as a black woman.

Initially, the Court notes that the plaintiff is proceeding *pro se* and that her submissions should be held "'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 59, 9. 101 S. Ct. 173, 66 L. Ed.2d 163 (1980) (quoting *Hines v. Kerner*, 404 U.S. 519, 520 92 S. Ct. 594, 30 L. Ed.2d 652 (1972)). District courts should "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). In addition, the Court should realize that conducting a trial by a *pro se* litigant is very difficult, and should consider this limitation in its rulings during the trial.

## I. BACKGROUND

The plaintiff Leslie Baldwin, a 42 year old black woman, contends that she was suspended as a Patient Care Associate ("PCA") on December 29, 2003 and was ultimately discharged because of her race. The plaintiff's claim of racial discrimination is essentially based on her contention that on November 28, 2001, a white PCA in another Monti (a section of the hospital) named Pamela Kling, was arrested for forgery in the second degree. She was charged with selling two prescriptions for Vicodin tablets in the name of Dr. Larry Gillman to another person for $300. There is no evidence in the record as to the disposition of this charge, namely, whether Ms. Kling was convicted. The plaintiff asserts that PCA Kling was

not similarly treated by being suspended and ultimately discharged, because she was a white female.

The plaintiff began working for North Shore in July 1997 as a PCA. On December 29, 2003, she received two disciplinary warnings and was suspended for one day. She was directed to report to the Employee Assistance Program ("EAP") for further consultation and action. Although the suspension was for one day, and the plaintiff reported for work on December 30, 2003, she testified that she was not allowed to work. Ultimately, after a number of proceedings and meetings with various employees and a doctor, she was discharged.

In addition, the plaintiff claims that at some point prior to her suspension, she became ill when three female co-workers allegedly poisoned her drinking water. The precise dates of these incidents are not clear from the record.

Nurse manager McGlynn testified that in addition to the poisoning claim, the plaintiff made allegations to her that her phone was bugged, there was a video camera in her bedroom, and someone put a bomb in her car.

**II.     DISCUSSION**

    **A.     The Rule 50 Standard**

In *This Is Me Inc. v. Elizabeth Taylor*, 157 F.3d 139 (2d Cir. 1998), the Second Circuit stated:

> [T]he recent adoption of term 'judgment as a matter of law' to replace both the term 'directed verdict' and the term 'judgment

> n.o.v.' was intended to call attention to the close relationship between Rules 50 and 56. A district court may not grant a motion for a judgment as a matter of law unless 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.' *Cruz v. Local Union No. 3, Int'l Bhd. Of Elec. Workers*, 34 F.3d 118, 1154-55 (2d Cir. 1994) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970)) (internal quotation marks omitted). Weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that 'a reasonable juror would have been compelled to accept the view of the moving party.'

*Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993). Recently, the Second Circuit reiterated the standard for a Rule 50 motion for a judgment as a matter of law. In *Fairbrother v. Morrison*, 412 F.3d 39 (2d Cir. 2005), the Second Circuit stated:

> Judgment as a matter of law in jury trials is provided for in Federal Rule of Civil Procedure 50. It may be granted against a party with respect to "a claim or defense that cannot . . . be maintained or defeated without a favorable finding" on an issue for which "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). This circuit has stated that judgment as a matter of law "may only be granted if there exists 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,' or the evidence in favor of the movant is so overwhelming 'that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" *Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir. 1997) (quoting *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154 (2d Cir. 1994)) (alterations in original). The motion should be granted "only if [the court] can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993). The Court cannot assess the weight of conflicting evidence, pass on the credibility of

4

> witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)).

*Fairbrother v. Morrison*, 412 F.3d 39, 48 (2d Cir. 2005), abrogated on other grounds, *Burlington Northern & Sante Fe Railway Co. v. White*, --- U.S. ---, 126 S.Ct. 2405, 165 L. Ed. 2d 345 (2006).

### B.     As to Race Discrimination

#### 1.     The *Prima Facie* Case

The procedure for demonstrating race discrimination follows the familiar *McDonnell-Douglas* order of proof for claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  First, the plaintiff must establish a *prima facie* case of discrimination by establishing the following elements:  (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.  *See de la Cruz v. N.Y. City Human Resources Admin.*, 82 F.3d 16, 20 (2d Cir. 1996) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Generally, a plaintiff's burden of establishing a *prima facie* case in the context of employment discrimination law is "minimal." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).

However, even with the minimal burden of establishing a *prima facie* case, the plaintiff has failed to establish the necessary fourth element, namely, that she was

suspended and then discharged under circumstances giving rise to an inference of racial discrimination. Giving the plaintiff the benefit of all credibility assessments and inferences, the plaintiff has failed to submit any evidence demonstrating circumstances that would permit a rational finder of fact to infer a discriminatory motive. *See Chertkova v. Connecticut General Life Insurance Co.*, 92 F.3d 81, 91 (2d Cir. 1996); *Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 204 (2d Cir. 1995).

The only evidence of alleged discrimination is the Pamela Kling arrest in November 2001. First, the arrest took place two years prior to the plaintiff's suspension. Second, Pamela Kling worked in a different Monti. Third, there is no evidence that Kling was convicted, although, with reasonable certainty, such evidence is readily available. Further, the Court notes that an arrest is an accusation only. Fourth, the hospital had nothing to do with her arrest, although it occurred on hospital grounds and Fifth, Pamela Kling was ultimately also discharged, although for a different reason.

BY MS. BALDWIN: (questioning of the plaintiff's supervisor Karen McGlynn)

> Q Could you tell me how she was reprimanded for being arrested?
>
> A When Pam was arrested, we didn't have any prior knowledge that she was going to be arrested, so it wasn't anything that we knew was going to happen. She was arrested.

> And she had been referred to employee health – not employee health, excuse me, the employee assistant program, EAP. So she went to them.
>
> Pam did, in fact, lose her job. It was related to sick time, sick time abuse. That's what she was counseled about, her sick time abuse.
>
> I wasn't privy to any details about her arrest. I was never contacted by the police nor a lawyer or anyone else. No one contacted me.

(Tr. at 181-182).

There is no other evidence of even alleged racial discrimination in this case. Therefore, even the minimal burden of establishing that the plaintiff's suspension and ultimate discharge occurred in circumstances giving rise to an inference of racial discrimination, was not met. *See Grady v. Affiliated Central Inc.*, 130 F.3d 553, 561 (2d Cir. 1997) ("The record in the present case is bereft of evidence from which a factfinder could infer that Affiliated discriminated against Grady on the basis of her age").

### 2. Circumstances Showing an Absence of Racial Discrimination at the Defendant North Shore University Hospital

There is considerable evidence in this case that there was no racial discrimination at the North Shore University Hospital and in its decision to suspend the plaintiff.

A.  Initially, the Court notes that Karen McGlynn, the Nursing Director of Oncology at the hospital, who suspended the plaintiff and who was a white woman, was also the supervisor who hired the plaintiff.

B.  At least one-half of the Patient Care Associates in the Oncology Section of the hospital were black.

C.  The plaintiff complained that three co-workers were poisoning her.  All three of these co-workers were black.

D.  Gloria Cohen, the Assistant Executive Director of the Human Resources Department at the hospital, who made the decision not to overturn the suspension order unless the plaintiff went to the Employee Assistance Program, was a black woman.

E.  Frances Clinton, the registered nurse at the 7 Monti Section, testified that of her ten PCAs, including the plaintiff, nine were minorities.

F.  Beth Hain, a registered nurse at the hospital, testified that the plaintiff told her that she was being poisoned by a black nurse.

G.  The plaintiff herself testified that most of the PCAs were black; that she never heard a discriminatory remark from a manager or from any co-worker; that the three co-employees who tried to poison her were black; that as of May 2004, the hospital was still holding her job open for her; that the dates of the disciplinary notices were all after her last performance evaluation; that if a patient made a complaint, that

would be an important fact and the hospital would have to take some action to address the patient's complaint; and that she was told she could be reinstated if she saw a psychiatrist and she declined to see any psychiatrist.

  H.  The plaintiff also testified that the real reason for her termination was her refusal to "cover up" her claim of being poisoned by three co-workers.

  All of this uncontroverted evidence clearly shows the absence of racial discrimination in the decision to suspend the plaintiff.

  **3.  There are Unrefuted and Clear Legitimate, Non-Discriminatory Reasons for the Plaintiff's Suspension and Ultimate Discharge**

  In this case, even assuming that the plaintiff has shown a *prima facie* case of racial discrimination, North Shore University Hospital has offered legitimate, non-discriminatory reasons for suspending the plaintiff.

  Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *See Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).  If the employer meets its burden, the plaintiff then must prove that the articulated justification is in fact a pretext for discrimination or that there is another discriminatory reason.  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

9

In this case there is documentary evidence of the plaintiff's performance and personality problems as a PCA in the oncology section of the hospital. In this regard, the Court also notes that the plaintiff's performance evaluations were initially very good and exceeded the standards. As time went on, these evaluations slowly changed from exceeding the standards to meeting the standards.

However, there is clear and convincing evidence of problems with the plaintiff's performance and personality, as follows:

Defendant's ("Dft.") Ex. C: verbal complaint of July 11, 2002: "Patient complaint of L. Baldwin, claiming she has a 'mean attitude.' 'She is very rough with me when she cleans me up.' 'She needs to be retrained.' Patient asks that plaintiff not care for her, especially a.m. care." Ms. Baldwin was very upset with the complaint and became very defensive about the patient's complaint, but did agree to the patient's requests. The patient was satisfied and stated she didn't want to get anyone in trouble, but she had to report this so that would not happen to any other patients.

Dft. Ex. D: verbal complaint of July 18, 2002 (seven days after the first complaint): "Patient complains of Ms. Baldwin's attitude. 'She never smiles. She is very rough with me, especially when she gets me up to the chair or bathes me. I almost fell, walking back to the bed with her. I don't want her to care for me.'"

"Spoke to Ms. Baldwin about complaints. She denies any of the above but agreed to remain out of the patient's room and let Scott do a.m. care on patient. Patient didn't want to have a complaint written for fear of retaliation."

Dft. Ex. E: verbal complaint of August 20, 2002 (just in part): "Patient stated she didn't want Ms. Baldwin to care for her because of problems she had with her on her last admission, and Ms. Baldwin denies any wrongdoing and stated that all the patients and families love her."

Dft. Ex. F: disciplinary warning and action taken on September 6, 2002 (after three verbal complaints.) The subject is "patient complaints." "You transferred to 7 Monti." "In that short period of time, three patients have complained about your attitude and behavior. They requested you not care for them. This is unacceptable, as it interferes with patient care and their recovery . . . And this attitude cannot be tolerated." "Immediate improvement must be seen, or further disciplinary action will be taken." And it indicates, "employee refused to sign."

Dft. Ex. G: The hospital progress note of September 29, 2002. This is a note by a staff nurse to the manager of the unit. She asked the plaintiff three times to draw blood from a patient. The plaintiff ignored her, and sat on a window ledge and refused to answer the bell.

Dft. Ex. H: another patient verbal complaint of December 18, 2002: The patient's wife complained that the plaintiff went in to take her blood pressure, inflated

11

the cuff on the arm and put the thermometer in the mouth and left it that way. The plaintiff told the patient: "I hate my job and hate coming to the hospital."

Dft. Ex. L: Patient Care Issue Referral Form of August 5, 2003: Mr. G, in room 716, requested that Ms. Baldwin not take care of him because she is very rude and has an attitude. "She needs to understand we are sick, and she must be more understanding."

Dft. Ex. M: verbal disciplinary action of August 13, 2003; insubordination - recorded by RN Clinton: Ms. Baldwin told Ms. McGlynn: "You can write whatever you want."

Dft. Ex. N: disciplinary warning notice and action taken of August 14, 2003: Leslie Baldwin, PCA, removed a monitor that was in use, thus interrupting urgent continuous monitoring initiated by RN Purvin. Ms. Baldwin removed the monitor without consulting with the RN caring for the patient.

Dft. Ex. O: Patient Care Issue Referral Form of October 5, 2003: Patient complains of neglect. "Made me feel scared and helpless. All I could do was cry." She was cold, and the plaintiff left her in the chair with her legs uncovered and told her to wait. Another nurse heard the patient crying and covered the patient. This was a second occasion.

Dft. Ex. P: verbal disciplinary action of November 18, 2003: On Wednesday, November 18, 2003 two staff members approached RN Clinton separately with

concerns in regard to Ms. Baldwin sitting on the window ledge outside 707 when several patient call bells were alarming. When they approached Ms. Baldwin for assistance, Nurse Clinton was told the plaintiff said she couldn't hear any bells in her area.

      Dft. Ex. Q: verbal disciplinary action of November 18, 2003 - insubordination. The second complaint by RN Clinton that day. Plaintiff refused to meet with the Nurse Manager and left for the day: "November 18, 2003, at approximately 1445, I approached Ms. Baldwin on 7-M and requested that she please see me before she went home. I went directly to my office and waited. At approximately 1515, M. Tekie went to find Ms. Baldwin and was told she had left for the day."

      Dft. Ex. R: verbal disciplinary action of November 19, 2003, the next day: "I asked Ms. Baldwin why she failed to see me before she went home on November 18th. Ms. Baldwin said: "You were busy talking to someone else, and if I were a good manager, I would have come and got her again." "Once again, I asked Ms. Baldwin to see me during the day. With no advance from Ms. Baldwin, myself and Tekie, went to the employee locker room and asked her to meet . . . Ms. Baldwin said the allegations were not true, and with an insubordinate tone informed me that I was an unfair manager and that I need to learn my job."

      "Ms. Baldwin was asked to join myself and Tekie to go to our director's office, since she was unresponsive to my attempt to encourage her to eliminate her attitude."

"Ms. Baldwin responded, stating she was off the clock, it was past the workday, and she would not meet with us to resolve this issue, and she was not leaving."

Dft. Ex. S: verbal disciplinary action of December 17, 2003: Another complaint about her not meeting the standards and being unapproachable.

Dft. Ex. T: patient care issue referral form complaint of December 17, 2003: "Mr. Kim feels he's not being treated fairly by the nurses he had today on the day shift. He is - - his bed was not changed. Her attitude coming into the room is defensive, sometimes bordering on rude. The perception by patient Kim is that she is unwilling to assist him when she comes into the room, and when he asks her to so something, he is being bothered."

Dft. Ex. U: verbal disciplinary action of December 20, 2003: Multiple staff members express concern as to the plaintiff being an unwilling team player, which is having an effect on patient care.

Dft. Exs. W and X: disciplinary warnings and notices: Referring to three patient complaints, and Ms. Baldwin's inappropriate manner and behavior, which repeatedly interferes with her daily responsibilities and ability to work with fellow health team members. This was December 29, 2003, and it notes:

"Employee refused to sign. Warning was read to her. Which is a disciplinary warning also dated December 29, 2003, entitled Conduct Detrimental to Our Striving to Provide Service Excellence. Continues to show an unsatisfactory behavior. It has

now accumulated to an insubordinate behavior that requires suspension, effective December 30th. Return to work the next day. Will require follow-up by Ms. Baldwin in EAP, following the referral made today. Again, employee refused to sign."

These valid non-discriminatory reasons stand without any evidence of pretext, nor is there any other discriminatory reason for Baldwin's suspension. *See, e.g., Bogdan v. N.Y. City Transit Auth.*, No. 02 Civ. 09587 (GEL), 2005 WL 1161812, at *8, (S.D.N.Y. May 17, 2005) (multiple complaints of poor job performance as legitimate, non-retaliatory reasons for employee's termination); *Costello v. St. Francis Hosp.*, 258 F. Supp. 2d 144, 155 (E.D.N.Y. 2003) (falsification of a time sheet constitutes legitimate, non-discriminatory reason for terminating employee); *Satterfield v. United Parcel Service, Inc.*, No. 00 Civ.7190 (MHD), 2003 WL 22251314, at *14 (S.D.N.Y. Sept. 30, 2003) (violations of policy, inappropriate absences, appearing in unauthorized work area, and insubordination constituted non-discriminatory reasons); *Myrick v. N.Y. City Emp. Retirement Sys.*, No. 99 Civ.4308(GEL), 2002 WL 868469 (S.D.N.Y. May 3, 2002) (incompetence and misconduct in the form of failure to meet a deadline in modifying an automated system; failure to submit update reports; and failure to produce project working document are legitimate, nondiscriminatory reasons for termination); *Velasquez v. Goldwater Memorial Hosp.*, 88 F. Supp. 2d 257, 261 (S.D.N.Y. 2000) (finding that the

plaintiff's "well documented disciplinary problems" provided non-discriminatory reason for her termination).

The proof of valid non-discriminatory reasons for the plaintiff's suspension and ultimate discharge is overwhelming.

The Court is well aware of the emotional distress and financial burdens suffered by the plaintiff and regrets these conditions. However, there is the general rule that an employer can suspend or discharge an employee at will for any reason, wise or unwise, fair or unfair, as long as this decision is not based on discrimination. Here, the Court finds that the plaintiff has failed to prove that her suspension and discharge was motivated in any respect, by her race.

### III.   CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that the motion by the defendant North Shore University Hospital pursuant to Fed. R. Civ. P. 50 for judgment as a matter of law is **GRANTED**; and it is further

**ORDERED**, that Judgment is rendered in favor of the defendant dismissing the complaint; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
January 18, 2007

/s/
ARTHUR D. SPATT
United States District Judge